IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMANDA PRELICH
*Plaintiff,*

v.                                                            Civil Action No.: ELH-10-3394

MEDICAL RESOURCES, INC.
*Defendant.*

**MEMORANDUM OPINION**

Amanda Prelich, plaintiff, was employed as a "MR Technologist" at Colonnade Imaging Center, a medical imaging center operated by Medical Resources, Inc. ("MRI"), defendant.[1] (Proposed) First Amended Complaint and Demand for Jury Trial ("Proposed Amended Complaint" or "Prop. Am. Compl.," ECF 15-2) ¶ 12. During her employment, plaintiff learned that she was pregnant with quadruplets, and requested accommodations as to her schedule and information about benefits. *Id.* ¶ 29. Citing reduction-in-force measures, defendant subsequently terminated plaintiff. *Id.* ¶ 31. The circumstances of plaintiff's termination led to the instant suit, brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[2]

MRI has filed a Motion To Dismiss ("Motion," ECF 11), which plaintiff opposes. *See* Plaintiff Amanda Prelich's Memorandum in Opposition to Defendant's Motion to Dismiss ("Opp'n" or "Opposition," ECF 14). On the same date that plaintiff filed her Opposition, she

---

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

[2] Plaintiff also brought a claim for retaliation under the Federal Medical Leave Act ("FMLA"), 29 U.S.C. § 2612 *et seq.* In a later filing, she voluntarily dismissed that claim. *See* ECF 14, at 15.

also requested leave to amend her complaint to allege additional facts relevant to her Opposition. *See* Plaintiff Amanda Prelich's Motion for Leave to File First Amended Complaint ("Motion to Amend," ECF 15).  Defendant opposes plaintiff's Motion to Amend, arguing that the amendment would be futile.  *See* ECF 16.  The issues have been fully briefed and the Court now rules on both motions, pursuant to Local Rule 105.6, no hearing being necessary.

## Factual and Procedural Background[3]

Plaintiff began her employment as a MR Technologist at defendant's Colonnade Imaging Center in Bel Air, Maryland on or about December 18, 2006.  Prop. Am. Compl. ¶ 12.  In July 2007, she informed both her "direct Supervisor" and the Area Center Manager ("Manager") that "she was undergoing medical in vitro fertilization procedures for the purposes of becoming pregnant." *Id.* ¶ 13.  She also indicated that, were she to become pregnant, defendant "would need" to accommodate her pregnancy by, "*inter alia*, allowing the Plaintiff periodic time off for appointments, and allowing the Plaintiff to avoid exposure to certain MRI equipment." *Id.*

In August 2007, plaintiff learned that she "was pregnant with twins." *Id.* ¶ 14.  She "immediately" shared the news with her "employer." *Id.*  On or about September 12, 2007, plaintiff's physician advised her that "her pregnancy was a high-risk pregnancy; that she should at no time become overly tired; that she would need to attend regular, if not weekly, appointments; and that she would need to be on bed rest beginning on or about January 18, 2008." *Id.* ¶ 15.  Plaintiff promptly informed her Supervisor of her physician's recommendations, and her Supervisor relayed that information to the Manager. *Id.* ¶¶ 16-17.

---

[3] I have drawn the facts from the Proposed Amended Complaint.

About two weeks later, on or about September 27, 2007, the Manager called plaintiff to a meeting to inform her, individually that defendant was "initiating a new work schedule." *Id.* ¶ 18.  In particular, plaintiff's "hours were being changed to include a new five-day, Monday through Friday work schedule,"[4] with alternating shifts each week.  *Id.*  The first week's shifts would "end as late as 10:30 p.m.," and the second week's shifts would begin "as early as 7:00 a.m."  *Id.*  Plaintiff was told that these scheduling changes, which were to go into effect the following day, "were being made because of the recommendations of an outside consulting group that MRI had hired to assess the efficiency of its operations."  *Id.*  In response to the scheduling change, plaintiff informed her Manager that the "new schedule could create medical issues for her because of her at-risk pregnancy and her doctor's advice."  *Id.* ¶ 19.  Therefore, "she asked that her medical needs be accommodated in the scheduling."  *Id.*

The following day, September 28, 2007, "after further reviewing the revised schedule," plaintiff contacted her Manager "to note that the new schedule required the Plaintiff to work on Mondays," the day on which she had pre-scheduled all of her weekly doctor's appointments (as Monday had previously been her regular day off).  *Id.* ¶ 20.  Plaintiff subsequently spoke to her Supervisor, and "the two of them were able to work together to arrange a revised schedule" that satisfied defendant's staffing needs while also accommodating plaintiff's pre-scheduled doctor's appointments.  *Id.* ¶ 21.

On October 2, 2007, plaintiff advised the Manager that she and her Supervisor had agreed on a revised schedule.  *Id.* ¶ 22.  The Manager did not respond, however.  *Id.*

---

[4] Previously, plaintiff did not work on Mondays.

On October 4, 2007, the Manager "confronted" plaintiff and told her that she "needed to confirm that she would comply with the new schedule." *Id.* ¶ 23. Plaintiff reminded the Manager that, "because of her high-risk pregnancy, the physical limitations it required, and the advice of her physician, she would not be able to work swing shifts." *Id.* ¶ 24. Nevertheless, the Manager "advised the Plaintiff that she had to either comply with the new schedule or resign from her employment." *Id.* ¶ 25. Plaintiff refused to resign. *Id.* ¶ 26. According to plaintiff, the Manager then "made no further attempt to understand what the Plaintiff's medical needs were or to accommodate them." *Id.* ¶ 27.

On October 8, 2007, plaintiff's physician informed her that she was pregnant with quadruplets. *Id.* ¶ 28. Her physician advised her that she was to remain on bed rest, and that "she should not return to work because of the special nature of her high-risk pregnancy." *Id.* In particular, she faced various complications associated with "multiple babies." *Id.* That same day, plaintiff "presented the Defendant with a letter from her Perinatologist." *Id.* ¶ 29. She informed her Supervisor and the Manager that she was pregnant with quadruplets, and that "she was unable to continue working," because her physician had instructed her to remain on bed rest. *Id.* She requested information as to leave under the FMLA, as well as information on her available paid leave and disability benefits. *Id.*

Plaintiff did not receive the information she requested. *Id.* ¶ 30. Accordingly, on October 18, 2007, she sent an e-mail to defendant, "again requesting information and forms relating to short term disability benefits." *Id.*

On or about November 5, 2007, by written correspondence, defendant terminated plaintiff's employment, stating that her position "was being eliminated due to a reduction in

force." *Id.* ¶ 31.   In conjunction with the termination, defendant offered plaintiff a severance payment in exchange for her signature on a release (the "Release"), by which she would relinquish the right to institute "'any action or complaint of any type in any administrative forum or court of law . . .' in order to receive the proposed severance." *Id.* ¶ 32-33 (quoting Release). The Release also required plaintiff to "maintain the confidentiality of the fact and terms of the Release or risk repayment of the proposed severance." *Id.* ¶ 33.   Plaintiff refused to sign the Release. *Id.* ¶ 34.   However, "she subsequently qualified for and received short term disability benefits." *Id.*

On December 12, 2007, plaintiff, through counsel, wrote to defendant (the "December 12 letter"). *Id.* ¶ 35.   Her counsel expressed concerns that plaintiff's termination violated anti-discrimination laws, the FMLA, and the ADA. *Id.*

By letter dated March 26, 2008 (the "March 26 letter"), defendant's counsel responded, reiterating that plaintiff had been terminated because her position as MR Technician was eliminated on the advice of an outside consulting firm that had determined that "there was low MRI volume at the Colonnade Imaging Center." *Id.* ¶ 36.   Further, the March 26 letter averred that, "even if there had been no reduction in force, Ms. Prelich would have been terminated based on several articulated for-cause reasons." *Id.*   According to Prelich, the March 26 letter was the first time "for-cause reasons" were "presented as a basis for termination."[5] *Id.*

According to plaintiff, "[w]ithin ten days, on April 6, 2008 and times surrounding, despite the suggestion that the position had been eliminated and there was no business need to fill it, the Defendant publicly advertised an available employment position for an MR

---

[5] The March 26 letter is not a part of the record, and the Proposed Amended Complaint does not set forth the alleged "for-cause reasons."

Technologist" at the Colonnade Imaging Center.[6]   *Id.* ¶ 37.   Further, plaintiff avers that defendant "knew or should have known that its failure to advise the Plaintiff of the reasons underlying her termination, its misrepresentations concerning the elimination of her position, and its issuance of the release in question would delay the Plaintiff's presentation of a discrimination claim."  *Id.* ¶ 38.

Three hundred and twenty-two days after plaintiff's termination, on September 22, 2008, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), "alleging discrimination on the basis of disability, discrimination on the basis of pregnancy, and retaliation."  *Id.* ¶ 8.   Plaintiff received a right-to-sue letter from the EEOC almost two years later, on September 7, 2010.  *Id.* ¶ 10.

This suit followed in December 2010.   Plaintiff's complaint sets forth six counts, as follows:   gender discrimination on the basis of pregnancy, in violation of Title VII and the Pregnancy Discrimination Act, 42 U.S.C. § 2000(e)(k) (Count I); disability discrimination on the basis of defendant's failure to accommodate, in violation of the ADA (Count II); disability discrimination on the basis of defendant's termination of her employment, in violation of the ADA (Count III); retaliation in response to plaintiff's request for accommodations, in violation of the ADA (Count IV); retaliation on the basis of defendant's offer of a Release, in violation of Title VII and the ADA (Count V); and retaliation on the basis of plaintiff's FMLA-related requests, in violation of the FMLA (VI).[7]

---

[6] The record does not reflect where the advertisement appeared.

[7] As noted, plaintiff voluntarily dismissed Count VI.  Opp'n 15.

## Discussion

### I.

Defendant has moved to dismiss plaintiff's Complaint (ECF 1) on the ground that it fails to state a claim upon which relief can be granted.  *See* Memorandum in Support of Motion to Dismiss ("Motion Memo.," ECF 11); *see also* Defendant's Response to Plaintiff's Motion for Leave to File First Amended Complaint ("Deft. Resp. Mot. Am. Compl.," ECF 16) 1.  Defendant also posits that plaintiff's Proposed Amended Complaint is futile.  *Id.*

Under FED. R. CIV. P. 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the Rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 n.3 (2007) (citation omitted).  Notably, the Rule demands more than bald accusation or mere speculation.  *Id.* at 555.  Thus, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient under the Rule.  *Id.*  However, the plaintiff need not include "detailed factual allegations in order to satisfy" Rule 8(a)(2).  *Id.*

A defendant may test the adequacy of a complaint by way of a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *German v. Fox*, 267 F. App'x 231, 233 (4th Cir. 2008).  However, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted).  In considering a motion to dismiss, the court must "accept the well-pled allegations of the complaint as true," and "construe facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff."

*Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Bass v. E.I. du Pont de Nemours & Co.*, 324 F.3d 761, 764 (4th Cir.), *cert. denied*, 540 U.S. 940 (2003).  But, the court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S. Ct. 1740 (2010).

Both *Twombly*, 550 U.S. 544, and *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009), make clear that, in order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Iqbal*, 129 S. Ct. at 1953 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions. . . .'" (citation omitted)); *see also Simmons v. United Mortgage and Loan Inv.*, 634 F.3d 754, 768 (4th Cir. 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  Thus, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly,* 550 U.S. at 556.  When the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'"  *Iqbal*, 129 S. Ct. at 1950 (citation omitted).

Rule 15 of the Federal Rules of Civil Procedure governs amendments to pleadings.  Rule 15(a)(1) grants a party the right to "amend its pleading once as a matter of course," if done within 21 days after serving the pleading.  FED. R. CIV. P. 15(a)(1)(A).  Or, "if the pleading is one to which a responsive pleading is required," a party may amend once as a matter of course,

provided that it does so within "21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  FED. R. CIV. P. 15(a)(1)(B).  Rule 15(a)(2) provides that, "[i]n all other cases," a party wishing to amend its pleading must obtain "the opposing party's written consent or the court's leave."  Notably, Rule 15(a)(2) states, in part: "The court should freely give leave [to amend] when justice so requires." *Id.*  Indeed, leave to amend should be denied "'only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'"  *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)).  Of relevance here, an amendment is futile "when the proposed amendment is clearly insufficient or frivolous on its face."  *Johnson*, 785 F.2d at 510.  An amendment is also futile if it would fail to withstand a motion to dismiss for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6).  *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995).

## II.

Defendant contends that plaintiff's claims under Title VII and the ADA, that is, Counts I through IV, are time-barred as originally filed, and as amended, because plaintiff filed her EEOC charge of discrimination after the expiration of the applicable limitations period.  Motion Memo. 2; Deft. Resp. Mot. Am. Compl. 2.

### A.    Statutory Framework

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42

U.S.C. § 2000e-2(a)(1).  The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The ADA incorporates the procedural requirements of Title VII.  *See* 42 U.S.C. § 12117(a) ("The powers, remedies, and procedures set forth in sections 705, 706, 707, 709, and 710 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9) shall be the powers, remedies, and procedures this title provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this Act, or regulations promulgated under section 106, concerning employment.").

A plaintiff filing suit under either Title VII or the ADA must first timely file a charge of discrimination with the EEOC or a state fair employment practices agency.  *See Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).  Typically, "a plaintiff must file an administrative charge with the EEOC within 180 days of the alleged misconduct."  *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004) (citing 42 U.S.C. § 2000e-5(e)(1)).  But, "[t]his period is extended to 300 days in a deferral state, one in which 'state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency.'"  *Valderrama v. Honeywell Tech. Solutions, Inc.*, 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007) (quoting *Williams*, 370 F.3d at 428), *aff'd*, 267 F. App'x 256 (4th Cir.), *cert. denied*, 555 U.S. 979 (2008).  Maryland, the state in which plaintiff was employed by defendant, is a deferral state.  Maryland's "deferral agency, the Maryland Commission on Human Relations (MCHR), has a work-sharing agreement with the EEOC, by which a claim filed before one commission is

effectively filed before both. *See* 29 C.F.R. § 1601.74 (designating MCHR as a Fair Employment Practices ('FEP') agency)." *Valderrama*, 473 F. Supp. 2d 662 n.2. Thus, it is undisputed that, in Maryland, a complainant has 300 days in which to file a charge of discrimination under Title VII or the ADA.

B.    *The Parties' Contentions*

As noted, plaintiff was terminated on or about November 5, 2007. Am. Compl. ¶ 31. However, she did not file her EEOC charge of discrimination until September 22, 2008, some three hundred and twenty-two days after her termination. Clearly, the filing extended beyond the 300-day time limit. *Id.* ¶ 8. Accordingly, MRI argues that Counts I through IV of plaintiff's Complaint, even if amended, are time-barred and subject to dismissal on that basis. Motion Memo. 3.

Plaintiff counters that the doctrine of equitable estoppel applies here, tolling the limitations period until April 6, 2008, when she learned that MRI had advertised for an MR Technician. Opp'n 12. As a result, asserts plaintiff, she timely filed her EEOC Complaint. *Id.*

In support of her position, plaintiff argues that defendant misled her as to the actual reasons for her termination. *Id.* at 7, 10. Plaintiff asserts: "Ms. Prelich was advised that the changes to her work schedule and her ultimate termination were due to a reduction in force." *Id.* at 10. According to plaintiff, defendant's representations of a reduction in force deprived her of "the opportunity to assess the propriety of the proffered reasons underlying her dismissal," and "interfered with [her] knowledge of facts necessary to approach the EEOC." *Id.* at 11. Moreover, plaintiff maintains that defendant continued to advance its reduction-in-force rationale until she received the March 26 letter. *Id.* at 10. Thus, she asserts that, at the time of her

- 11 -

termination and even after she retained counsel, "she was not aware that MRI intended to fill the position that it supposedly had eliminated, nor was she aware of whether that position would be filled by someone outside of the protected classifications at issue in this case." *Id.*

Prelich insists that, by way of the March 26 letter, she and her counsel were made aware that plaintiff's termination "was the result of anything other than the elimination of her position due to a reduction in force." *Id.* at 11.  Further, she avers that "it was only on April 6, 2008, when MRI advertised for an MR Technician at its Colonnade facility that [she] gained sufficient information to put her on notice that MRI's representations concerning the reduction in force had been false." *Id.* at 12.  According to plaintiff, her "mere suspicion" of discrimination was insufficient to trigger limitations.  Plaintiff Amanda Prelich's Reply to Defendant's Opposition to Plaintiff's Motion for Leave to File First Amended Complaint ("Mot. Am. Reply," ECF 18) 4.  In addition, she asserts that any factual dispute as to when she was put on sufficient notice cannot be resolved at this juncture. *Id.* at 6.

In reply, defendant maintains that it "did not conceal from Plaintiff the information she needed to file an EEOC complaint."  Reply in Support of Motion to Dismiss ("Reply," ECF 17) 4.  Defendant contends that "Plaintiff admits this fact" in her allegation that plaintiff's counsel contacted defendant, in the December 12 letter, with concerns that plaintiff's termination had been discriminatory. *Id.*  Further, defendant contends that plaintiff's termination, by itself, "provided her with information necessary to file an EEOC complaint," and "equitable estoppel does not apply." *Id.*

### C.     Equitable Tolling and Estoppel

As the Supreme Court made clear in *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980), the filing period for a charge of discrimination begins to run when the employee is informed of the allegedly discriminatory employment decision.  *See Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982).  However, a plaintiff's failure to file a timely charge of discrimination with the EEOC is akin to a statute of limitations, in that it "is subject to waiver, estoppel, and equitable tolling."  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); *cf. Henderson v. Shinseki*, 562 U.S. ___, 131 S. Ct. 1197, 1203 (2011) ("Among the types of rules that should not be described as jurisdictional are what we have called 'claim-processing rules.'  These are rules that seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.").  Nevertheless, "[t]he Court applies equitable exceptions sparingly because the certainty and repose the [procedural] provisions confer will be lost if their application is up for grabs in every case."  *Moret v. Geren*, 494 F. Supp. 2d 329, 337 (D. Md. 2007); *see English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987), *cert. denied*, 486 U.S. 1044 (1988).

The doctrines of equitable tolling and estoppel derive from the notion "that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing her claim on time."  *English*, 828 F.2d at 1049; *see Lekas v. United Airlines, Inc.*, 282 F.3d 296, 301 (4th Cir. 2002) ("The element common to both doctrines is some form of misconduct by the defendant.").  "Equitable tolling applies where a defendant, by active deception, conceals a cause of action.  And equitable estoppel applies where 'the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline,' even though

the plaintiff knows that it exists." *Lekas*, 282 F.3d at 301 (citation omitted) (quoting *English*, 828 F.2d at 1049).

"To invoke equitable tolling, the plaintiff must . . . show that the defendant attempted to mislead her as to whether there was a factual basis for filing a claim and that the plaintiff reasonably relied on this misrepresentation in neglecting to file a timely charge." *Moret*, 494 F. Supp. 2d at 337. "Equitable tolling focuses on the plaintiff's excusable ignorance of the employer's discriminatory act." *Felty v. Graves-Humphreys Co.*, 785 F.2d 516, 519 (4th Cir. 1986) [*Felty I*]; *see also Olson v. Mobil Oil Corp.*, 904 F.2d 198, 201 (4th Cir. 1990) (denying an employee the benefit of equitable tolling because the employee was aware, at the time of his termination, of organizational charts revealing his employer's "intent to replace him personally rather than simply abolish his position [as part of a reduction in force], as it had represented").

In contrast, "[e]quitable estoppel . . . examines the defendant's conduct and the extent to which the plaintiff has been induced to refrain from exercising his rights." *Id.* The doctrine of equitable estoppel will not toll a filing period "'unless the employee's failure to file in a timely fashion is the consequence of either a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.'" *Moret*, 494 F. Supp. 2d at 388 (quoting *Price*, 694 F.2d at 965).

In *Felty I*, the plaintiff worked for Graves-Humphreys Inc., which was later acquired by the Frank Paxton Corp. in February 1982. 785 F.2d at 517. The Frank Paxton Corp. then formed the new corporation of Graves-Humphreys Company. *Id.* After the acquisition, the Vice-President of the Graves-Humphreys Company "conducted a meeting in which she notified employees of the new organizational structure resulting from the acquisition and consequent

terminations." *Id.*   At that meeting, each employee received "a copy of an organizational chart containing the names, positions, and ages of certain employees." *Id.*   "When several employees questioned the notation of ages on the document, [the Vice-President] indicated that the wrong chart had been distributed," and "[a] new document, identical to the first except that the ages . . . were deleted, was then distributed." *Id.*

At a subsequent meeting, in November 1982, the Vice-President informed employees that there would be reductions in the work force. *Id.*   The Vice-President then met individually with each employee who was to be terminated, including sixty-year-old Felty. *Id.*   "During the individual conference, [the Vice-President] informed Felty . . . that the reason for his termination was the elimination of his position." *Id.*   He also stated that, if Felty "discussed the terminations with anyone he would be subject to immediate dismissal." *Id.*   After the individual meetings, the Vice-President offered a severance package to each employee who was to be terminated, conditioned on his or her continued employment with Graves-Humphreys Company until the formal termination dates. *Id.*   Felty chose to accept the severance package, but he discussed his termination, which he believed had been based on age discrimination, with a co-worker. *Id.* at 517-18.   Plaintiff's last day of work was on February 28, 1983, and "[a]t some time during February, he consulted an attorney and expressed a suspicion that his termination was based on his age." *Id.* at 518.   He filed his age discrimination claim with the EEOC on June 2, 1983. *Id.*

"At trial, Felty maintained that because of the [Vice-President's] threat of immediate dismissal he did not discuss the termination process with other employees until after March 31, 1983." *Id.*   The district court granted judgment in favor of the employer on the ground that Felty had failed to timely file his EEOC complaint. *Id.*   It reasoned that equitable tolling was

inapplicable, as Felty's conversation with a co-worker indicated that he "knew the facts necessary to support an EEOC complaint charging age discrimination in his termination, in spite of warnings by the employer which were allegedly designed to prevent just such knowledge." *Felty v. Graves-Humphreys Co.*, 604 F. Supp. 730, 733 (W.D. Va. 1985).

On appeal, Felty again contended that "he did not know until after his termination that Graves-Humphreys was engaged in a discriminatory practice of dismissing its older employees." *Felty I*, 785 F.2d at 518. He argued that his ignorance merited equitable tolling of the filing limitation period. *Id.* The Fourth Circuit disagreed, stating: "[W]e cannot find that the district court's factual conclusion that [Felty] had sufficient knowledge to file a complaint on November 12, 1982 [was] 'clearly erroneous.'" *Id.* at 519 (citation omitted).

However, the Fourth Circuit also stated: "We believe the district court failed to recognize that a material question of equitable estoppel was also raised on the facts presented." *Id.* at 519. In the Court's view, whether the Vice-President's order not to discuss his termination "was a rational effort to preserve employee morale or whether it was a blanket gag order that unreasonably extended to possible communications with an attorney or the EEOC [was] in dispute." *Id.* The Court reasoned, *id.* at 520: "[A] generous severance arrangement conditioned upon compliance with a code of silence would be a powerful inducement that might well lure an older worker into failing to defend his rights." Further, it stated, *id.*:

> If an employer engages in activity that it knows or reasonably should know will cause an employee to delay the filing of a discrimination complaint, then the statutory limitation period must be modified. . . . [to] exclude[] from the [limitations] period such time as the employer's coercion effectively operates to delay the employee's efforts to enforce his rights.

According to the Court, "[a]ny affirmative act by the employee to enforce his rights would indicate that the employer's improper influence has ended," and that the employee can no longer be said to be reasonably relying on the alleged misconduct.  *Id.*  The Court left open the question of whether plaintiff's "discussion with [plaintiff's] attorney would demonstrate that any coercion had lost its effect." *Id.* (emphasis added).  The Court remanded to the district court, so that it could "consider whether Graves-Humphreys' actions improperly delayed Felty's EEOC complaint," such that equitable estoppel would apply. *Id.*

On remand, the district court determined that equitable estoppel did not apply because the employer had not improperly delayed the filing of Felty's EEO complaint.  Therefore, it granted summary judgment to the employer.  The Fourth Circuit affirmed.  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128-29 (4th Cir. 1987) [*Felty II*].  It stated:  "It has always been an element of estoppel that the plaintiff *actually and reasonably rely* on the alleged misconduct in foregoing an assertion of his rights." *Id.* (emphasis added).  In the Court's view, Felty "admitted three separate times that his delay in filing the claim did not result from improper conduct on the part of Graves-Humphreys." *Id.* at 1129.

With this background, I turn to consider the authorities submitted by plaintiff from other courts, which have fact patterns similar to the instant case.

*Rhodes v. Guiberson Oil Tools Division*, 927 F.2d 876 (5th Cir. 1991), involved a fifty-six-year-old plaintiff, Calvin Rhodes, whose employer, Guiberson Oil, claimed that Rhodes was discharged, in October 1986, as part of a reduction in force.  *Id.* at 877.  However, Rhodes learned in December 1986 that Guiberson Oil had hired a forty-two-year-old for his former position.  *Id.*  Because Rhodes did not file his complaint with the EEOC within the applicable

filing period, he sought the benefit of equitable estoppel.  *Id.* at 879.  The trial judge found that Rhodes's claim was time-barred because plaintiff had failed to set forth evidence of any specific actions on the employer's part that had prevented plaintiff from approaching the EEOC sooner than he did.  *Id.* at 879-80.  The Fifth Circuit reversed, concluding that the trial judge's decision was clearly erroneous.  *Id.* at 880.  The appellate court noted that, because "the oil industry was in a recession" at the time, the employer's reduction-in-force "explanation seemed highly credible."  *Id.*  In its view, "the company's misstatements [that Rhodes was terminated because of a reduction-in-force] lulled Rhodes into not approaching the EEOC sooner."  *Id.*  The court also observed that "Guiberson Oil told Rhodes that he would be considered for re-hiring."  *Id.* at 882.  Thus, the court concluded that "the facts clearly demonstrated at trial that Guiberson Oil concealed facts and misled Rhodes. . . . There was no reduction in work force as far as Rhodes' position went."  *Id.* at 881.  It reasoned: "Knowing that he was 56-years-old and would be discharged from his job was simply not enough to go to the EEOC and file a charge when [he] was told that he was being discharged because of a reduction in work force . . . ."  *Id.* at 882. Accordingly, the Court held:  "The filing period was tolled under equitable estoppel until Rhodes discovered the falsity of Guiberson Oil's statements."  *Id.* at 881.

In *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir. 1994), the plaintiff, Joseph Sturniolo, was terminated in October 1990 from his position as sales manager.  His employer informed him that his termination was part of a plan to preserve financial resources, and that his sales area was being absorbed into another region, resulting in the elimination of his position.  *Id.*  However, "several months after his discharge," in "early 1991," Sturniolo learned that a younger individual had replaced him.  *Id.* at 1025-26.  Because Sturniolo filed his EEOC

charge after the filing deadline, the district court awarded summary judgment to the employer. *Id.* at 1025.   Relying on *Rhodes*, the Eleventh Circuit reversed.   It stated:   "[T]he fact that Sturniolo was 58 years old at the time of his discharge did not constitute sufficient evidence to file a charge of age discrimination with the EEOC."   *Id.* at 1026.   Sturniolo's "mere suspicion" about age discrimination, "unsupported by personal knowledge," was insufficient to override the presumptively legitimate reason his employer had given him at the time of discharge.   *Id.*   The court concluded:   "The date when Sturniolo knew or should have known that [his employer] had hired a younger individual to replace him is the date upon which the tolling period should commence."   *Id.*   In view of "genuine issues of material fact" as to the issue of equitable tolling, the court remanded the case to the lower court.   *Id.* at 1026 n.2.

Finally, plaintiff cites *Jones v. Dillard's, Inc.*, 331 F.3d 1259 (11th Cir. 2003).   In that case, the plaintiff, Gerda Byrd, worked in a department store as an "assistant area sales manager."   *Id.* at 1261.   In May 1999, the store began a restructuring of its workforce and intended to eliminate her position because of poor sales.   *Id.* at 1261-62.   As such, it offered plaintiff "an opportunity to sell cosmetics on the sales floor."   *Id.* at 1261.   She declined, and had to choose between taking another managerial position or severance.   *Id.*   Byrd opted for the latter.   *Id.*   However, in June 1999, Byrd learned that the company had instructed the store's operations manager to hire two new assistant area sales managers.   *Id.*   In September 1999, the company hired a woman for plaintiff's former position.   *Id.* at 1262.   Byrd filed an EEOC charge on February 24, 2000.   *Id.* at 1262.   The district court granted summary judgment to the employer on the ground that the complaint was untimely.   *Id.*

On appeal, Byrd argued that the limitations period should have been equitably tolled. *Id.* at 1263. Relying on *Sturniolo*, the Eleventh Circuit said: "[T]he reason given by Dillard's for the elimination of Byrd's position not only appeared business-related, but also believable. A person with a reasonably prudent regard for her rights would not suspect a cause of action for age discrimination at this point." *Id.* at 1265. According to the court, plaintiff's "mere suspicion," in June 1999, was "insufficient to establish" her awareness of pretext with respect to her employer's stated reason for discharge. *Id.* at 1266-67. Relying on equitable tolling, the Eleventh Circuit reversed. *Id.* at 1266. It reasoned, *id.*: "Not until November 1999 is her suspicion confirmed . . . . At this time, she has sufficient evidence to support her age discrimination claim."

*Rhodes*, *Sturniolo*, and *Jones* establish that a plaintiff's "mere suspicion" of discrimination does not necessarily overcome the plaintiff's reliance on a defendant's seemingly credible explanation for termination. Where a defendant's representations hide the actual circumstances of discharge, mislead, or conceal a potential cause of action, equitable tolling may apply.[8] Conversely, when the evidence shows that a plaintiff has knowledge of pretext at the time of termination, equitable tolling is inappropriate. And, when a plaintiff delays filing a charge for reasons that cannot be attributed to the defendant, the plaintiff is not entitled to the benefit of equitable estoppel.

Here, while plaintiff was employed by defendant, she was told of a new work schedule, supposedly based on recommendations made by an outside consultant. At the time of plaintiff's

---

[8] It is true that the *Rhodes* Court mentions equitable estoppel. But, in my view, the Fourth Circuit has clearly distinguished active concealment, associated with equitable tolling, from misconduct, associated with equitable estoppel.

termination, she was expressly told that it was due to a reduction in force.  Drawing all favorable inferences in plaintiff's favor, as I must at this stage, the Proposed Amended Complaint adequately alleges that plaintiff was not aware of the alleged falsity of the grounds for her termination at the time of her discharge, due to the conduct of defendant.[9]

As noted, plaintiff's counsel wrote to defendant on December 12, 2007, expressing plaintiff's concerns that her termination had been based on discrimination, in violation of the ADA.[10]  In the light most favorable to plaintiff, the December 12 letter appears to mark the earliest date on which plaintiff was on notice of her potential claim.  Therefore, for purposes of the motion to dismiss, the Court shall apply the doctrine of equitable tolling through December 12, 2007.  Using that date, plaintiff's ADA and Title VII claims were timely filed.[11]

Accordingly, the Court will deny defendant's motion to dismiss Counts I through IV.  I will also grant plaintiff's Motion to Amend.

## II.

Defendant has also moved to dismiss Count V, a retaliation claim based on defendant's offer of the Release.  Motion Memo. 5.  According to defendant, "[t]he mere offer of an

---

[9] To the extent that plaintiff has argued specifically for equitable estoppel, it is this Court's view, after reviewing the cases presented by plaintiff, that she has actually requested the benefit of equitable *tolling*.

[10] Plaintiff argues that "the fact that an employee has hired counsel or may have been aware of her rights in general does not preclude the application" of equitable estoppel.  Opp'n 10.  My determination does not turn on plaintiff having hired counsel, or general awareness of rights.

[11] Presumably, discovery will determine whether plaintiff was actually aware of the pretext before or after December 12, 2007.  As the Court will permit equitable tolling on the basis of plaintiff's allegations as to defendant's misrepresentations and improper conduct, I need not presently consider plaintiff's argument for equitable estoppel based on defendant's actions in offering her a severance package.

unenforceable settlement agreement does not constitute retaliation" as a matter of law.  *Id.*

Because plaintiff "did not sign" the Release, and "she does not allege that Defendant withheld

benefits already promised or owed to her," defendant argues that plaintiff cannot establish a

claim for retaliation.  *Id.* at 6.

Plaintiff responds by asserting that the Release was "facially retaliatory" because it would

have "prohibited her from instituting actions or complaints" against defendant, and "[t]he penalty

for breach of the confidentiality provisions was the return of any severance paid."  Opp'n 15.

In *EEOC v. Nucletron Corp.*, 563 F. Supp. 2d 592 (D. Md. 2008), this Court (Legg, J.)

considered a similar situation.  Peter Dove, upon his termination, was offered a severance

payment conditioned on his agreement not to file a discrimination suit or charge.  *Id.* at 595.  The

severance agreement also contained a confidentiality provision.  Defendant's Motion to Dismiss

or for Partial Summary Judgment, at Exh. 1, *Nucletron Corp.*, 563 F. Supp. 2d 592 (No. L-07-

2644), ECF No. 5-1.  Because Dove refused to sign the severance agreement, he did not receive

the severance benefits, and he was not bound by any proposed restrictions.  *Nucletron Corp.*, 563

F. Supp. 2d at 596.  The EEOC sued, asserting that the mere offer of such a severance agreement

constituted "facial retaliation" because several portions of it (i.e., the portion that required an

employee to waive his right to file or participate in an EEOC discrimination charge) were

unenforceable.  *Id.* at 597.  The district court, however, determined that "[t]he mere offer of the

severance package . . . does not fit the definition of retaliation under Title VII," because the

employer had not actually taken a "sufficiently adverse employment action."  *Id.* at 599.[12]

---

[12] The court later distinguished a separate theory advanced by the EEOC (a theory that is
not advanced here):  that the severance package was available as a matter of course to all

Plaintiff avers:   "*Nucletron* is distinguishable in that it did not involve a release that conditioned severance on the waiver of EEOC charge filing rights <u>and</u> which imposed confidentiality provisions that required the return of severance payments in the event of breach." Opp'n 15.   Plaintiff is mistaken.   The severance agreement in *Nucletron*[13] reveals that it also contained a confidentiality provision that required the return of severance monies in the event of breach.[14]   If the mere offer of the *Nucletron* severance agreement was not an actionable, adverse employment action, the mere offer of the Release here is not an adverse employment action. Accordingly, Count V is dismissed, with prejudice.

A separate Order consistent with this Opinion will follow.


Date: August 19, 2011                              /s/_____
                                                   Ellen Lipton Hollander
                                                   United States District Judge


---

(...footnote continued)

employees, but in Dove's case alone, it was made contingent on signing the severance agreement. *Id.* at 600.

[13] Under FED. R. EVID. 201, a court may take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."   Therefore, I shall take judicial notice of the severance agreement in *Nucletron*, as it is available electronically via PACER or this Court's CM/ECF.   *See also Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) (holding that a district court may "properly take judicial notice of its own records").

[14] Arguably, the *Nucletron* severance agreement is more restrictive in that it also contained a prohibition on "disparaging remarks."